

Source: DivestSPD

Michael Settle holds a less sordid record than his riot-attending counterparts. Still, his role as a detective rather than a uniformed officer may have allowed him fewer chances to generate complaints from the public.

Annual salary: $117,500.

## The Police and the Mayoral Race

As Seattle heads into a crowded election to find a new mayor with no incumbent running, the candidates may feel increased pressure to explain how they plan to handle the ideological divide between Seattle's residents, local activists, and the officers they employ.

On Monday, outsider mayoral candidate Andrew Grant Houston called for removing all officers that attended the insurrection. Houston is considered a long-shot candidate, yet he has led the conversation regarding police reform, penning an open letter to his rivals, "Defund or Drop Out" on April 15.

Many candidates and nearly all the Seattle City Council members have demanded Mike Solan's resignation for his comments around the Capitol attack.

*"SPD demonstrates, once again, that they are unable to put public safety, transparency, and accountability in front of their own self-preservation."*

*— Andrew Grant Houston*

The discovery of these officer's identities, paired with sustained distrust of police and incremental reform efforts nationwide, threatens to make SPD's budget a divisive and unavoidable topic for mayoral and city council candidates. While one campaign has made its position clear, others have played coy, offering little more than laughable policies and promises to "reimagine" policing in the city.

While these officer's specific actions at the Capitol are still unclear, it is evident that SPD breeds a hypocritical culture. On the one hand, they savagely and aggressively respond to police brutality protests in Seattle, no matter how small or unassuming. Yet, all officers have remained quiet regarding their coworker's desire to subvert democracy for former President Trump, who lost King County by over 600,000 votes.

How these candidates and their voters respond to these six officers' involvement with the Capitol riot could shape SPD's future. Only time will tell.

# Unmasked at last: All Seattle cops at fascist Jan. 6 rally have been identified

Liberation Staff-Seattle April 30, 2021

8904 minutes read

Download PDF flyer

*Feature image: Seattle Police Department attempts to secure the area outside Rancho Bravo on Capitol Hill after deploying chemical weapons against protestors. Taken during the George Floyd protests in Seattle. Photo: Derek Simeone, Attribution 2.0 Generic (CC BY 2.0)*

The names of all six Seattle Police Department officers who attended the fascist Jan. 6 rally in Washington, D.C., have been finally revealed. In a lengthy and exhaustive Twitter thread, DivestSPD posted names, badge numbers, and personnel records for each of the officers, detailing salaries and their long histories of complaints and disciplinary actions. Of all law enforcement agencies in the nation, the Seattle Police Department had the most officers confirmed to have been in Washington, D.C. on Jan. 6.

The public already knew that an investigation was underway into the conduct of these six officers, but until now their identities had remained secret. Relying on police rosters for January and publicly-available data, DivestSPD identified the case number for the investigation, and was able to definitively identify the officers. The group then referenced the Office of Police Accountability complaint database to surface the numerous complaints against these officers. The complaints are shocking and describe gratuitous violence against members of the public.

Sgt. Jacob Briskey #6824 works in the canine unit, drawing a base salary of nearly $122,000, and was hired in 2004. He has been named in five lawsuits that have cost the city more than $500,000. He roughly arrested a Black youth on false charges and beat, tasered, and falsely arrested a sleeping elder. While breaking up a backyard party, he fractured a young man's shin when he stomped on his leg.

Alexander Everett #8565 and Caitlin Rochelle #8566 are a married couple who transferred to Seattle from Texas. In their three year careers with SPD, they have amassed a combined 10 OPA complaints for excessive use of force and bias. They each draw a salary of more than $95,000.

Jason Marchione #8490 works the same beat as Caitlin Rochelle and has had six OPA complaints since 2017, one of which was for breaking a man's wrist during arrest. Marchion uses force against Blacks significantly more often than the SPD average. Fully 45% of his uses of force were against Black people. His salary is $107,000.

Sgt. Scott Bach #6711 has been with SPD since 2001 and has a salary greater than $138,000. He was previously the acting lieutenant of the Major Crimes Unit. The day after the Capitol riots, he was transferred to the Southwest Precinct and possibly demoted to sergeant. Bach currently has three active OPA investigations against him, and had been named in a lawsuit from 2008 alleging illegal search and seizure.

Sgt. Detective Michael Settle #6625 works on the vice squad and has a base salary of $117,500.

Borne out of the national uprising against racism that erupted after the murder of George Floyd in Minneapolis, DivestSPD is an organization of activists, journalists, and citizens working to cut off the hose of money given to the Seattle Police Foundation by corporations in the city. The Seattle Police Foundation is SPD's non-profit arm, and is used to supplement the department's already bloated budget to purchase equipment and fund projects. Police foundations are not required to list their donors. As such, they are massive pools of dark money and serve to influence the department and provide a protection racket for corporations.

Despite the liberal and progressive image the city of Seattle enjoys, the Seattle Police Department has a long history of violence and discrimination. In 2012, following years of killings by police and arrests that disproportionately targeted Black, Indigenous, homeless and other vulnerable people, the Seattle Police Department was placed under a consent decree with the Justice Department. The consent decree was intended to reform the Seattle Police Department, instituting policing practices that are not in violation of the Constitution.

On May 7, 2020, the city of Seattle filed a motion to end the consent decree. In their petition, Mayor Jenny Durkan said,

*The Seattle Police Department has transformed itself. The original investigation of SPD showed force was being used unconstitutionally far too often, and frequently involved people in crisis or under the influence. Nearly a decade later, as we submit the final report under the sustainment plan, Seattle police officers have become a national leader in policing and de-escalation with a commitment to true and lasting reform.*

On May 25, George Floyd was murdered and a nationwide rebellion was born. The Seattle Police Department gassed, beat, and terrorized activists and turned the area surrounding the East Precinct and Cal Anderson Park in the neighborhood of Capitol Hill into an uninhabitable warzone. The Seattle Police Department continued their violent tactics in contradiction of a ban on these "crowd control" weapons. Under immense sustained pressure from the City Council, and facing a recall campaign, the city and mayor relented and dropped the request for an end to federal supervision of SPD.

These six officers are not the exception; they are the rule. The police cannot be reformed. No matter the whitewashing or pinkwashing, no matter how many police march at Pride, the police will always serve the capitalist class and their private property. When challenged, they will always default to violence; it is in their class nature. To abolish the police, we must abolish capitalism.

Tags

anti-fascismpolice brutalityseattle

# Rantz: Seattle cops forced to give personal texts, financial records to city under termination threat

**Share**
**BY JASON RANTZ**
**JUNE 16, 2021 AT 5:20 AM**



(AP Photo/John Minchillo, File)

Six Seattle police officers who attended President Donald Trump's January 6 speech are being forced to prove their innocence during an investigation. And if they don't submit personal documents to the city, they face termination.

The investigation into the officers began in January. Two officers posted photos on social media showing themselves at Trump's speech at the Capitol. Then four other officers self-reported they, too, were in D.C. Each officer was on vacation, and none were in uniform.

Though there was no evidence that any of the officers participated in the riot, the civilian-led Office of Police Accountability (OPA) began a proactive investigation to see if any of the officers broke any laws. Months into the investigation, sources say no evidence has emerged of any wrongdoing. And none of the officers have been federally charged for any illegal behavior. That doesn't mean OPA won't offer findings of guilt

against an officer for witnessing an illegal act at the Capitol without reporting it.

But now a new demand: Turn over private documents or be fired.

**Rantz: Seattle City Dept. defends vicious all-staff email labeling cops white supremacists**

**Police ordered to turn over private documents**

The Jason Rantz Show on KTTH has confirmed that the OPA ordered the officers to turn over several personal documents around their trip to D.C.

The documents include text messages to family or friends, photographs taken while in D.C. on vacation, receipts from hotels or restaurants they patronized, and even personal bank records during the time they were there.

According to an internal email from the Seattle Police Officers Guild (SPOG) to members, obtained by the Jason Rantz Show on KTTH, "the city told us that Director Myerberg's order was supported with the threat of termination."

"I can confirm that OPA has ordered the officers to provide evidence of their whereabouts and activities on January 6 and, specifically, during the time that the insurrection was ongoing within and around the U.S. Capitol. This includes receipts, texts, photographs, and records of financial transactions," OPA director Andrew Myerberg explained to the Jason Rantz Show on KTTH.

JASON RANTZ

Rantz: Seattle cops forced to give personal texts, financial records to city under termination threat

Share

**BY** JASON RANTZ
**JUNE 16, 2021 AT 5:20 AM**



(AP Photo/John Minchillo, File)

Six Seattle police officers who attended President Donald Trump's January 6 speech are being forced to prove their innocence during an investigation. And if they don't submit personal documents to the city, they face termination.

The investigation into the officers began in January. Two officers posted photos on social media showing themselves at Trump's speech at the Capitol. Then four other officers self-reported they, too, were in D.C. Each officer was on vacation, and none were in uniform.

Though there was no evidence that any of the officers participated in the riot, the civilian-led Office of Police Accountability (OPA) began a proactive investigation to see if any of the officers broke any laws. Months into the investigation, sources say no evidence has emerged of any wrongdoing. And none of the officers have been federally charged for any illegal behavior. That doesn't mean OPA won't offer findings of guilt against an officer for witnessing an illegal act at the Capitol without reporting it.

But now a new demand: Turn over private documents or be fired.

Rantz: Seattle City Dept. defends vicious all-staff email labeling cops white supremacists

**Seattle police union pushes back on Jan. 6 investigation**

The city's police watchdog is investigating 6 Seattle police officers who were in D.C. on Jan. 6. The union has filed a grievance.

by

- David Kroman

/ July 7, 2021



*In this Jan. 6, 2021, file photo insurrectionists loyal to President Donald Trump breach the U.S. Capitol in Washington, D.C. (John Minchillo/AP)*

Seattle's largest police union has been working behind the scenes to limit the city's investigation into six officers who were in Washington, D.C., on Jan. 6, the day a mob breached the Capitol building.

The union and its members are specifically targeting the Office of Police Accountability, which on Thursday is likely to release the findings of its investigation into whether the officers participated in the insurrection or only attended a rally on behalf of former President Donald Trump.

On May 27, the Seattle Police Officers Guild filed a grievance against the city, alleging that investigators' demands for travel receipts, photos, text messages and other documentation of the officers' attendance

violated the nondiscrimination clause in the union's contract with the city. The union has called on the Office of Police Accountability, which is tasked with investigating external and internal complaints against police employees, to destroy personal records it has collected from the six officers.

At the same time, one officer who was in D.C. has accused a top civilian employee with the OPA of leaking his name to Crosscut. The city's Human Resources investigations unit is looking into his allegations. Crosscut has declined requests to aid in the investigation and does not comment on sourcing.

Both of these efforts follow a previous attempt in King County Superior Court by the six D.C. attendees to block the disclosure of their names to the public. The union supported the officers in their petition. A judge denied that request.

The OPA first began looking into the officers' Washington, D.C., trip after images surfaced of two Seattle Police Departmet employees attending the rally on behalf of Trump. In response, interim Seattle Police Chief Adrian Diaz placed the two employees on paid leave and asked any other employee who had traveled to D.C. to come forward. Four more said they had attended the "stop the steal" rally; lawyers for all six employees say the officers did not participate in the storming of the Capitol building.

The OPA is likely to release its findings to the public as soon as Thursday. Diaz said he would fire any officer found to have participated in the insurrection.

Since news broke of the officers' attendance, the Seattle Police Officers Guild has sought to keep those officers' names out of the public eye and to limit OPA's investigation on several fronts. First, the union unsuccessfully fought in King County Superior Court to block several standing public records requests for the officers' names, including from news organizations in Seattle.

# Malcontent News

In 18 months, 20% of SPD officers have quit the force

Protests planned for Franklin Graham's police appreciation dinner in Bellevue

BIPOC

# SPD officers in Washington, D.C. during January 6 insurrection tentatively identified

Seattle had the most off-duty officers attend the January 6 rally and insurrection in the nation.

Published
2 months ago
on
April 26, 2021
By
**Malcontent News Staff**



[SEATTLE] – (MTN) Researchers have tentatively identified the names and backgrounds of the 6 Seattle police officers who attended the Stop the Steal rally that devolved into an attempt to stop the certification of the 2020 election. Crosscut and our researchers had identified three officers previously.

The six Seattle police officers who allegedly were in Washington, D.C., during the insurrection are:

- Scotty Bach, Acting Lieutenant through January 6, 2021, now listed as Sergeant
- Jacob Briskey, Sergeant, K9 Officer
- Alexander Everett, Officer, previously identified
- Jason Marchione, Officer, previously identified by Crosscut
- Caitlin Rochelle, Officer, previously identified
- Michael Settle, Vice Unit, Acting Sergeant

SPD listed Scotty Bach as an Acting Police Lieutenant assigned to the Southwest Precinct on October 15, 2020. The data shows he was an Acting Lieutenant through January 6, 2021, and returned to the rank of Sergeant on January 7. Bach is currently under investigation by the OPA for three separate incidents.

Sergeant Jacob Briskey has been the subject of multiple uses of force complaints, and the city of Seattle had to pay a $269,000 settlement in 2009. In that case, Romelle Bradford sued for being wrongly arrested by Briskey and being "roughed up," per a Seattle Times report in 2008. The city appealed the finding and ultimately lost the case.

Alexander Everett and Caitlin Rochelle were previously identified as a married couple who went to the January 6 Stop the Steal Rally. Acting Chief Diaz suspended the couple with pay after other officers came forward and reported their activity in Washington, D.C. They were married in December 2020, and it is reported that the trip to hear Donald Trump speak was their honeymoon.

Jason Marchione is assigned to the South Precinct, and Crosscut previously revealed his attendance at the insurrection on January 6. Marchione and Rochelle are coworkers who work on the same shift. Marchione has had six OPA complaints since he started with SPD in 2017, and almost half of the use of force claims against the officer have been made by Black people. In one case, a Black man claims that Marchione broke the man's wrist during a "hard takedown."

Michael Settle is an Acting Police Sergeant Detective specializing in human trafficking. Little is know about Settle beyond a single investigation in 2010.

A court hearing was initially scheduled for April 2, 2021, to review a temporary injunction, but that hearing was declared moot.

Andrew Myerberg, the director of the OPA, told NPR, that officers are entitled to their political views, and the investigation will look into whether SPD policy was violated. The OPA added that if the officers committed federal crimes, they would work together with federal investigators.

The OPA has 180 days to release its findings of the officer's activities to the public. Those results would be published in June and early July of 2021.

**Please Support Malcontent News**

**Read the Full Transcript**

- **Judy Woodruff:**

Today marks six months since a pro-Trump mob attacked the U.S. Capitol on January the 6th, in an attempt to stop the certification of Joe Biden's election win.

For a deeper look at the investigations into that day, I'm joined now by our Lisa Desjardins.

Hello, Lisa.

So, tell us now, where does it stand in terms of finding out and arresting those who broke into the Capitol?

- **Lisa Desjardins:**

Let's talk about this sweeping investigation that has been all around the country, led by tips, in part, to the FBI.

Here is where that stands. So far, the FBI has arrested about 535 people in these investigations. Now, from that group, 10 have pleaded guilty themselves. The rest have cases pending.

Now, there is a wide range of different kinds of charges. Almost everyone in that group has been charged with improper entry, but a smaller group has been charged with conspiracy, and over 100 people have been charged with assault.

Over 100 police officers were assaulted in that attack. And that's what those charges are part of. Now, there are still some 300 suspects that the FBI would like to identify and find.

They uploaded 11 new videos today of faces they want Americans to look at and see if they can identify. But among those who haven't been identified are the people or person who planted the pipe bombs at the Republican and Democratic National Committee headquarters.

A couple of other notes. We know where these sentences are going just based on a few guilty pleas, some for misdemeanors, like improper entry. A woman recently was given three years probation for that. She apologized in court. And that's why she got a lenient sentence.

But, on the other hand, we just saw a guilty plea from an Oath Keeper who pleaded guilty to conspiring to, in fact, trying to overturn the election. That person's sentence is still pending, but could be more than five-and-a-half to six-and-a-half years, so a wide range in the seriousness of sentences that these people face.

- **Judy Woodruff:**

And, Lisa, what about inside the Capitol? Where are we in terms of the attempt to find out who was responsible in terms of investigations and also to make sure the Capitol is safe?

- **Lisa Desjardins:**

That's right.

That is a big question right now. The U.S. Capitol Police put out a release today saying here's where they are. And I want to break down what we know about Capitol security going forward.

One thing that's new, Capitol Police are actually opening two offices in Florida and California to deal with threats against members. That shows you what's going on in these offices. A lot of these members are getting threats continuing after January 6.

Now, the fences outside the Capitol, the last fences are expected to come down this week. There is still no deal on money to improve security at the U.S. Capitol. That is stuck in the Senate right now. And, in addition, I have to say, Capitol Police at this moment still cannot call in the National Guard for an emergency on their own. They still have to go through red tape to do it.

So, in other words, where we are is a lot of issues unresolved. Now, House Democrats passed a select committee to look into this because they could not get agreement on a bipartisan commission. That is operating, eight Democrats — eight appointed by Nancy Pelosi and five could be appointed by Republicans. We will see if they do it.

That will be probably the next thing to watch.

**House Speaker Nancy Pelosi**

Government Official

Speaker of the House, focused on strengthening America's middle class & creating jobs.

The violent domestic attack on Congress on January 6th was the worst assault on the Capitol since the War of 1812 and the worst domestic assault on American Democracy since the Civil War. We are facing a radically new threat in the kinds of forces that combined to attack our government on January 6th. The future of our democracy is on the line. This assault was an attempt to overthrow the government.

We need a comprehensive investigation as to who organized this attack, who paid for it, how they nearly succeeded in overthrowing a presidential election, why they did it and how we must organize ourselves to prevent anything like it from ever happening again.

It had been our hope to establish a bipartisan, independent National Commission, but there is no prospect for that Commission at this time because of insufficient support from Republican Senators. Therefore, the House established the Select Committee to Investigate the January 6th Attack on the U.S. Capitol. The Select Committee on the January 6thInsurrection will investigate and report upon the facts and causes of the terrorist mob attack on the United States Capitol on January 6, 2021. It will also be charged with reporting its findings, conclusions and recommendations for preventing future attacks.

Monday evening, the Minority Leader recommended 5 Members to serve on the Select Committee. I have spoken with him this morning about the objections raised about Representatives Jim Banks and Jim Jordan and the impact their appointments may have on the integrity of the investigation. I also informed him that I was prepared to appoint Representatives Rodney Davis, Kelly Armstrong and Troy Nehls, and requested that he recommend two other Members.

With respect for the integrity of the investigation, with an insistence on the truth and with concern about statements made and actions taken by these Members, I must reject the recommendations of Representatives Banks and Jordan to the Select Committee.

The unprecedented nature of January 6th demands this unprecedented decision.

21K21K

4.6K Comments

2.5K Shares

**Like**

Operator: 911 what's your emergency?

Raquel: Um, dispute, with my...44th Ave SW.
I told her to call the police, she came out and started hitting me, and I knew this was going to happen 3 years ago. A long story short, I want her out of my house. I called my parents, and they live 6 blocks away, they are gonna start walking over, but I wanna go pick them up as soon as i get off the phone with you.

O: She was hitting you?

R: Yes, she came out into the lawn. I was picking up some stuff out of the garage, out of my basement, the whole entire house, by the way is mine, she does not have ID that she lives here, and I told her to leave a long time ago. She's locked up all the doors, and, I don't even know if I can go into my own home.

O: Ok, so she's inside now?

R: She's inside, and she will not answer the door.

O: Any weapons?

R: Not that I know of.

O: Do you know if she's high or intoxicated?

R: I'm sorry?

O: Do you know if she's high or intoxicated?

R: Um, usually on drugs.

O: Do you know what kind of drugs?

R: Probably medicine, probably medicine of some kind. She's very sick.

O: Ok. Um, (1:00)

R: I don't want her arrested. And that's the only reason I've never called the police before but I knew this was going to happen.

O: Ok what's her name? (1:06)

R: Raquel, r-a-q-u-e-l. Last name is Reynolds. R-e-y-n-o-l-d-s.

O: Her date of birth?

R: 4/2/69

O: And what race is she?

R: we're...I am.

O: oh, ok. Um, all right, hold on, just a second. And how tall is she?

R: 5 2' 3ish.

O: Slim, medium or heavy?

R: Um, over maybe a little bit.

O: Ok, what kind of clothing is she wearing today?

R: Um, kind of floweryish. Like I don't know she was,

O: Like a flowery top? Or is she wearing a dress?

R: yeah, yes everything happened so fast.

O: Ok. What color hair does she have?

R: black.

O: is it short, long?

R: Its long.

O: Ok. (2:00) she have glasses?

R: yes.

O: OK.

R: She may have already have called you. I don't know.

O: yeah, I don't see a call in.

R: I didn't think she would, because she's not supposed to be in this house, at all. I wanted her out 3 years ago, just so you know what this has escalated to. And I knew this was gonna happen.

O: Is there any sort of orders in place between you 2?

R: No, my parents won't let me.

My brother just came back. He was, I just texted him, he'll be here. I just see him walking over. Um, I, I told my parents I was gonna pick them up, but maybe I'll just wait. They might walk over, but they're very old, so it's gonna take them awhile.

O: Ok, and, uh,

R: is it OK for me to go pick them up?

O: I mean it's totally up to you. Do you, anybody, and you included, your parents uh your sister or anybody, have any signs of COVID cough, fever, shortness of breath?

R: I've already had COVID if that answers your question.

O: Ok. so you don't have it now? (3:00)

R: no, in February.

O: And what is your phone number?

R: 2062581000

O: OK 2062581000?

R: Yes.

O: Ok. All righty, um, ok, yea, as long as you guys stay separated I will disconnect, um, yea, you can go, um, if you wanna get your parents, we'll have officers wait there when they get there.

R: Is it going to be awhile?

O: They're on their way now.

R: Hold on a second....I'm not going to...I'm waiting.

Rick:.....

R: Because, she, we're, the police are coming. I'm just going to have to wait here. This is my house. You want me just to leave? Mom and dad are on their way.

Rick: What did she do?

R: She hit me. She came out here and just started, ask everybody here, she just came up after me. I told everybody, I said, call the police right now, and then, my neighbor.

Rick:....

R: No, I told them not to. I said that's the reason I haven't called in 3 years. In 3 years, because I don't want her to go to jail. I said I didn't want her to be arrested. But this is going to be crazy. (4:00)

Rick:.....

R: She got mad because we are emptying out my basement you saw the crap we took.

Rick: ....

R: I told you.

Rick:...

R: No, she took that box that I had. That piece of shit box recycle.

O: Do you know what type of medication she takes?

R: No, I do not. I have not spoken to her in 3 years. Like I said she took over my house she thinks it's hers now.

O: Ok, has she, how long has she been there for?

R: She's been here for 3 years. She had an eviction notice 3 years ago.

O: Ok, do you live there as well?

R: I'm sorry?

O: Do you live there as well?

R: I have all my things here, yea. But I don't live here because, like I said, I had covid back in February and I was with my parents, they were taking care of me.

O: Ok, but you said you haven't spoken to her in 3 years but she's been living there for 3 years.

R: I sent her text messages. I send her email..

O: So, ok, I'm just trying to confirm so you don't live there full time? You haven't lived there in 3 years,  but you are the owner of the house?

R: I don't know what you mean by live (5:00) take a shower? I mean I left because I was on my mom's couch, for 3 years, I mean for 6, 7, months now they've been taking care of me cuz they don't want this dramatic thing to happen, which they knew was going to.

O: Ok, yea, yea, I understand that you've been staying with your parents because you had Covid but, um, were you staying with them before that too, since your sister lived at this house for 3 years?

R: On and off.

O: Ok, all right.

R: I Can't stand her. I can not stand,  I leave, I'm here, I take care of everything there is in this house, except for 1 room.  That 1 room she put a lock on it. She won't let me in there, unless I destroy the door, I can't get into her room.

O: Ok, and you're the owner of the house?

R: I've been fixing it, I've been doing all of the remodeling on it, I've been fixing, my parents come over, um, I've done a lot of work to the house, this is my house, she has nothing to do with it, and there's no contract. Like I said, I could have kicked her out 3 years ago.

O: You said you did serve her with an eviction notice?

R: Oh, God, I served her one 2 years ago,  and I have pictures of everything. I have pictures of her car, I, (6:00) believe it or not, I was married to a, I married a Seattle police officer, and then he went to Homeland Security, so, I know all about pictures, and everything.  Um, she, that's another reason that I know she hated me was cuz I was with law enforcement.

O: Ok. All righty, well, ok, yea, just wait outside, well, um well,  they're on their way.

R: She has a record for what she just did.  And she did it to my brother back in 20, I don't even remember what year it was,  if you want to look up back on the record,  but she already has a record, that's another reason I don't want her to go to jail again, cuz she already did.

O: Ok. Yea, um, I mean, I can't guarantee what the officers are going to do when they get there. But just talk to them when they get there and they can get it all sorted out.

R: I don't know what to do. She was just driving me crazy.

O: Yes just, just, stay there and talk to the officers.

R: Do you know who's working? Who's going to be..

O: I don't know which ones are going to be dispatched there, but, they're on their way.

R: Is, uh, (7:00) I don't know who's working nights, but if Joel Nark or Joel Houston are working, um, they know who I am. Or you can ask them if they want to come by and take this call. I'm trying to think of who else, but,

O: Yea, I mean I, I'm just entering the call, I don't dispatch the officers, so, uh,

R: Ok.

O: Yea, I can't guarantee, but, yea, you can talk to them when they get there, and they'll get everything sorted out.

R: Ok. Thank you.

O: You're welcome. Bye bye
.

# Report Number 2020-252740 - Incident / Offense Report Report

| REPORT DATE / TIME | PRECINCT / SECTOR / BEAT / RA | CAD EVENT START DATE / TIME - CAD EVENT END DATE / TIME |
|---|---|---|
| Aug 28, 2020 19:38 | SW / W / W2 / 6997 | Aug 28, 2020 18:01 – 18:42 |

REPORT WRITER

PETE CAVINTA #6246

ASSISTING PERSONNEL / TYPE(S)

DANIEL KIM #8716 (Backing Officer), GERMAN BARRETO #7590 (Backing Officer), KIRA GUZMAN #8506 (Arresting Officer, Transport Officer), RAYMOND FISCHER #8599 (Arresting Officer, Transport Officer), SCOTTY BACH #6711 (Screening Supervisor)

REPORT TAKEN LOCATION

████ 44 AV SW, SEATTLE, WA 98136

| EMS / FIRE / OTHER LE AGENCIES ON SCENE | UNIT |
|---|---|
| ■ YES □ NO | SFD E-32 |

EVENT STATISTICS

- □ Event Contains Bias Elements
- □ AED Used
- □ Naloxone Administered
- □ DEMS
- □ Cybercrime
- □ Event is DV Related
- □ Homelessness
- □ Shots Fired
- □ Hate Graffiti
- ■ Body Worn Video
- ■ ICV Exists

## NARRATIVE

On the listed time and date, Officers were dispatched to a domestic violence assault incident at ████ 44 Ave. SW. Dispatch indicated;

RP'S SISTER CAME OUTSIDE & BEGAN HITTING RP. SUSP BACK INSIDE. NO WPNS

The caller was listed as Raquel Reynolds and the suspect was identified as ████████ Dispatch also reported that the other half has called 911. Further updates on the call indicated that complainant ████ ████ is waiting in the bedroom, reporting party's brother is on scene and their parents are enroute. Also noted: Reporting party does not want the suspect arrested. This started as a dispute over property or contents of a box. Per the call, ████ said her brother Enrique is here, was known to be violent in past, hurts animals, not assaultive.

Officers arrived at the scene which was calm. A female and a male calmly stood on the sidewalk directly in front of the home. The female identified herself as Raquel Reynolds and she identified the male as her brother Enrique Martinez. Raquel said she is the property owner of the home and had allowed her sister ████ to live at the residence for three years and that her social worker and attorney advised her to evict ████ from the property, but she has not initiated the eviction process. I explained the eviction process and suggested that she contact her attorney.

Reynolds became upset, was easily distracted, and would provide past incidents about her relationship with ████ I attempted to obtain information about the assault incident. Reynolds was inconsistent with her account of the incident between she and ████ Reynolds said ████ had assault her, but she could not provide details about how ████ had hit her. Reynolds said ████ snatched garbage out of her hand. I asked her about the garbage and she said it was a bag, but then later said it was an empty box.

Reynolds said she and her brother Enrique arrived at the home to check on a freshly planted tree. Per Reynolds after the brief landscape inspection, Enrique departed and she went to the basement through an exterior door on the side, gathered some property, and loaded her the boxes in her car. At some point, ████ rushed out of the house, confronted her in the front yard, and attacked her. However, Reynolds was not able to provide details about the assault and gave conflicting statements.

I asked Reynolds if ████ threatened to cause physical harm to her during the dispute, but she said, "No." About that time Reynolds' mother arrived at the scene. She used a walker. ████ identified her mother as Graciela Martinez. Reynolds was easily distracted and lost focus with my interview as she would speak to her mother. I had to tell her to focus on my questions and I had her move further away from her mother who spoke with a back-up officer at the scene.

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| PETE CAVINTA #6246    Aug 28, 2020 23:24 (e-signature) | SCOTTY BACH #6711    Aug 29, 2020 00:38 (e-signature) |
| PRINT NAME | PRINT NAME |
| PETE CAVINTA #6246 | SCOTTY BACH #6711 |

I asked Reynolds to describe how ▮▮ struck her and demonstrated a closed fist as I struck my palm, or an open palm slap, a hammer-fist strike against my palm as examples, but she said, "No." Reynolds said she did not know how she was assaulted. I asked Reynolds to demonstrate what ▮▮ did to her and she held her arm in a horizontal manner across in and front of her lower neck area, but then she said she was not sure.

Reynolds said ▮▮ pushed her down. I asked her if she fell down, but she said, "No, I caught myself." I asked Reynolds if anyone witnessed the assault and she said there were multiple witnesses who were walking their dogs, but none of them remained at the scene. Reynolds said the multiple witnesses called 911, but the call only listed her and her sister ▮▮ as the only complainants to this call. Reynolds said her brother Enrique did not witness the incident and had departed the property prior to the confrontation.

I asked Reynolds if she was injured and she said she previously had surgery on her neck. I did not see any fresh injuries, marks, scratches, or redness on her throat area. Reynolds said ▮▮ snatched the garbage out of her hand which she said was a bag then later said it was a box. There were no visible injuries to Reynold's hands, arms, nor face.

▮▮ ▮▮ was contacted at the rear door of the home. ▮▮ appeared to be calm and she was cooperative. During my contact, I noticed a minor abrasion to ▮▮ top layer of her left upper bicep area about 3-4" long. The scratch was not bleeding, but the skin had a rub mark where the surface was disturbed. I asked ▮▮ how that happened and she said her sister grabbed her arm and tried to pull her toward her when she recovered her box which contained her lock and tried to return back inside of the house. ▮▮ described the action and leaned her body away as if she was using her bodyweight to pull in the opposite direction with her arm out to her side as if it was being held by another person. ▮▮ held her right arm as she was holding a box. ▮▮ pointed to her left wrist and complained of pain. SFD requested and SFD E-32 responded. They provided an ice pack and ▮▮ declined further aid from the scene. ▮▮ recovered her box which contained a lock that she wanted to remain at the home.

Based on ▮▮ narrative and the visible minor injuries and complaint of pain to her left arm, there was probable cause to arrest Reynolds as the primary aggressor for domestic violence assault.

Reynolds was taken into custody, but she became highly agitated and continued to scream at the scene. Reynold's mother Graciela became upset and attempted to intervene and tried to persuade officers that we were arresting the wrong person, that she was sick and would die in jail. At one point, Graciela abandoned her walker and tried to come to the aid of her daughter secured in the back of the patrol car, but officers had to block her path and prevent her from advancing.

Reynolds was rushed out of the scene and Sgt. Bach screened the arrest at a nearby safe location. I gave Graciela a SPD business card with an incident number.

Officer Barreto obtained a recorded statement from ▮▮ I obtained photos of ▮▮ injury with my SPD issued cellphone. Photos and statement were submitted into DEMS. Officer Barreto gave ▮▮ a SPD business card with an incident number and a DV pamphlet. Sgt. Bach screened the incident and arrest. Reynolds was transported and booked into KCJ.

**CONFIDENTIAL**

*REPORTING PARTY-1*

| REPORTING PARTY-1 (PERSON) | | DOB / ESTIMATED AGE RANGE |
|---|---|---|
| **R-1 REYNOLDS, RAQUEL** | | **1969-04-02** |

| SEX | RACE / ETHNICITY | PHONE NUMBER |
|---|---|---|
| **Female** | **White / Not Hispanic Or Latino** | **(206) 258-1000 (primary, Home), (425) 200-4060 (Mobile)** |

HOME ADDRESS

**5027 41 AV SW, SEATTLE, WA 98136**

REPORTING PARTY SIGNATURE

## OFFENSE-1

OFFENSE CODE

**RCW - 9A.36.041 | ASSAULT - ASSAULT 4**

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| **PETE CAVINTA #6246   Aug 28, 2020 23:24 (e-signature)** | **SCOTTY BACH #6711   Aug 29, 2020 00:38 (e-signature)** |
| PRINT NAME | PRINT NAME |
| **PETE CAVINTA #6246** | **SCOTTY BACH #6711** |

| OFFENSE START DATE | OFFENSE END DATE | OFFENSE COMPLETION | DOES EVENT CONTAIN BIAS ELEMENTS? |
|---|---|---|---|
| **Aug 28, 2020 18:01** | **Aug 28, 2020 18:42** | ▪ COMPLETED <br> ☐ ATTEMPTED | ☐ YES ▪ NO |

| DOMESTIC VIOLENCE | WEAPON / FORCE INVOLVED |
|---|---|
| ▪ YES ☐ NO | **Personal Weapons (hands, fist, feet, arms, teeth, etc.)** |

GANG INFORMATION

**No Gang Involvement/Unknown**

### *OFFENSE LOCATION*

LOCATION NAME / STREET ADDRESS/LOCATION NAME / APT, UNIT, STE / DESCRIPTION

▪ **44**

| CITY | STATE | ZIP |
|---|---|---|
| **SEATTLE** | **WA** | **98136** |

| LOCATION CATEGORY | PRECINCT / SECTOR / BEAT / RA | PUBLIC / PRIVATE |
|---|---|---|
| **Residence/ Home** | **SW / W / W2 / 6997** | **Private** |

### *VICTIMS-1*                                                    **CONFIDENTIAL**

| VICTIMS-1 NAME (LAST, FIRST MIDDLE) | DOB / ESTIMATED AGE RANGE |
|---|---|
| **V-1** ▪▪▪ ▪▪▪ | **1965-**▪▪ |

| SEX | RACE / ETHNICITY | PHONE NUMBER |
|---|---|---|
| **Female** | **White** | **(206)** ▪▪▪ **(primary, Cell)** |

HOME ADDRESS

▪ **44, SEATTLE, WA 98136**

VICTIM IS OFFICER

☐ YES ▪ NO

### *SUSPECTS-1*                                                  **CONFIDENTIAL**

| SUSPECTS-1 NAME (LAST, FIRST MIDDLE) | DOB / ESTIMATED AGE RANGE |
|---|---|
| **S-1 REYNOLDS, RAQUEL** | **1969-04-02** |

| SEX | RACE / ETHNICITY | PHONE NUMBER |
|---|---|---|
| **Female** | **White / Not Hispanic Or Latino** | **(206) 258-1000 (primary, Home), (425) 200-4060 (Mobile)** |

HOME ADDRESS

**5027 41 AV SW, SEATTLE, WA 98136**

## MEDICAL ADDENDUM                                          **CONFIDENTIAL**

REPORT NUMBER

**2020-252740**

| INJURED PERSON-1 NAME (LAST, FIRST MIDDLE) | DOB / ESTIMATED AGE RANGE |
|---|---|
| ▪▪▪▪ | **1965**▪▪ |

| WHERE INJURED-1 | INJURY TYPE | DESCRIPTION OF INJURY |
|---|---|---|
| **Left Arm** | **Apparent Minor Injury** | **minor abrasion** |

MEDICAL TREATMENT

**None**

## RELATIONSHIPS ADDENDUM                                    **CONFIDENTIAL**

| NAME | RELATIONSHIP | SUBJECT |
|---|---|---|
| **RAQUEL REYNOLDS** | **SIBLING OF** | ▪▪▪▪ |

## ATTACHMENTS ADDENDUM

| FILE NAME | UPLOAD DATE/TIME | UPLOADED BY |
|---|---|---|
| **dv sup 20-252740.pdf** | **Aug 28, 2020 23:09** | **P. CAVINTA #6246** |

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| **PETE CAVINTA #6246   Aug 28, 2020 23:24 (e-signature)** | **SCOTTY BACH #6711   Aug 29, 2020 00:38 (e-signature)** |
| PRINT NAME | PRINT NAME |
| **PETE CAVINTA #6246** | **SCOTTY BACH #6711** |

This report was generated in Mark43 and the e-signature was affixed using the undersigned officer's unique login and password. I certify (or declare) under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct to the best of my knowledge and belief.

| ELECTRONICALLY SIGNED | DATE | PLACE |
|---|---|---|
| PETE CAVINTA | 08/28/2020 | Seattle, WA |

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| PETE CAVINTA #6246    Aug 28, 2020 23:24 (e-signature) | SCOTTY BACH #6711    Aug 29, 2020 00:38 (e-signature) |
| PRINT NAME | PRINT NAME |
| PETE CAVINTA #6246 | SCOTTY BACH #6711 |

# Domestic Violence Supplemental Form

## Suspect Information

| Last Name | Reynolds | First Name | Raquel | MI | | DOB | 04 02 196_ | Sex | F | Race | W |
|---|---|---|---|---|---|---|---|---|---|---|---|

**Demeanor**
Document in narrative any other notable observations of physical appearance

- [ ] Afraid
- [ ] Apologetic
- [x] Crying
- [ ] Irrational
- [x] Agitated
- [x] Belligerent
- [x] Distraught
- [ ] Nervous
- [ ] Angry
- [x] Calm
- [ ] Hysterical
- [ ] Threatening

Other (describe): Crying and distraught when arrested

**Injured?** [ ] Yes [x] No
(If yes, describe in narrative/diagram)

- [ ] Abrasions
- [ ] Bruises
- [ ] Complaint of Pain
- [ ] Lacerations/Bleeding
- [ ] Redness
- [ ] Bite Marks

Other (describe):

**Status** [x] Booked [ ] GOA [ ] Cited    **Photographs of the Suspects Taken?** [ ] Yes [x] No

**Mental Health** [ ] Yes [ ] No [x] Unknown    **Medications?**    **Past Hospitalizations?**    **Suicidal?** [ ] Yes [ ] No [ ] In past [x] Unknown

**Under the Influence of Alcohol/Drugs?** [ ] Yes (describe)    [ ] No [x] Unknown

## Victim Information

| Last Name | | First Name | | MI | G | DOB | 196_ | Sex | F | Race | W |
|---|---|---|---|---|---|---|---|---|---|---|---|

| Address | 44 Ave. SW | City | Seattle | State | WA | Zip | 98136 |
|---|---|---|---|---|---|---|---|

| Cell # | (206) | Work # | | Home # | | Email | |
|---|---|---|---|---|---|---|---|

| Primary Language? | English | Language Line/Communication method used | | Who called 911? | |
|---|---|---|---|---|---|

| Who can always reach victim? | | Phone # | | Another contact | | Phone # | |
|---|---|---|---|---|---|---|---|

**Demeanor**
Document excited utterances using quotations; any notable observations of physical appearance (e.g. torn clothing)

- [ ] Afraid
- [ ] Apologetic
- [ ] Crying
- [ ] Irrational
- [ ] Agitated
- [ ] Belligerent
- [ ] Distraught
- [ ] Nervous
- [ ] Angry
- [x] Calm
- [ ] Hysterical
- [ ] Threatening

Other (describe):

**Under the Influence of Alcohol/Drugs?** [ ] Yes (describe)    [x] No [ ] Unknown

**Pregnant?** [ ] Yes [ ] No [x] Unknown   If yes, how long?    **Does suspect know victim is pregnant?** [ ] Yes [ ] No [x] N/A

**Injured?** [x] Yes [ ] No
(If yes, describe in narrative, photograph, diagram)

- [x] Abrasions
- [ ] Bite marks
- [ ] Blow to head
- [ ] Bruises
- [x] Complaint of pain
- [ ] Hair pulled
- [ ] Lacerations/Bleeding
- [ ] Redness
- [ ] Restrained
- [ ] Sexually Assaulted
- [ ] Swelling

Other (describe):

**Strangulation?** [ ] Yes [x] No
[ ] Aid called? **Aid should be called if strangulation occurred regardless of signs or symptoms**

- [ ] Neck Pain
- [ ] Ears Ringing
- [ ] Neck Swelling
- [ ] Scratches
- [ ] Sore throat
- [ ] Nausea/Vomiting
- [ ] Difficulty swallowing
- [ ] Fainting/Unconsciousness
- [ ] Raspy voice/Voice changes
- [ ] Light-headed
- [ ] Red marks
- [ ] Bruising
- [ ] Tiny red spots mouth/eyes/ behind ears/face? (Petechia)
- [ ] Loss of bodily function?
- [ ] Loss of ability to breathe? – For how long?

**Prior incidents of strangulation?** [ ] Yes [x] No   If yes, how many and describe

**Treatment?** [ ] N/A [ ] Refused [ ] At hospital [x] At scene / Who provided on-scene treatment? SFD E-32   Signed medical release? [ ] Yes [x] No [ ] Refused

**Threats Harassment Stalking**
Threats to harm? [ ] Yes [x] No  If yes, describe
Threats to kill? [ ] Yes [x] No
Victim fearful? [ ] Yes [x] No

Unwanted contact? [ ] Yes [x] No   [ ] In Person [ ] Text/Phone [ ] E-mail [ ] Social media    Under surveillance? [ ] Yes [x] No (document in narrative)

**Photos taken of Victim?** [x] Yes [ ] No    **Electronic/Physical Evidence recovered?** [ ] Yes [x] No

## Relationship History and Risk Assessment

- [ ] Spouse
- [ ] Former Spouse
- [ ] Formerly Resided Together
- [ ] Child in Common
- [ ] Parent/Child
- [ ] Estranged Spouse
- [ ] Adults Residing Together
- [ ] Dating/Engaged
- [ ] Former Dating

Other (describe): Sister

**History**
Length of relationship: 54 years
If ever separated/tried to separate, when?

**Past incidents where suspect caused...**
Fear or harm? [ ] Yes [x] No
Violence against others? [ ] Yes [x] No
Physical? [ ] Yes [x] No
Forced sex? [ ] Yes [x] No
Verbal? [ ] Yes [x] No
Stalking? [ ] Yes [x] No
Harm to Children? [ ] Yes [x] No
Harm to Pets? [ ] Yes [x] No

Hx of controlling Victim's activities? [ ] Yes [x] No
Hx of jealousy, accusations of cheating? [ ] Yes [x] No
Getting worse? [ ] No [x] Uncertain [ ] Yes in severity [ ] Yes in frequency
Hx of threats? [ ] No [ ] To harm [ ] To kill [ ] With firearm/weapon

Has suspect prevented victim from reporting/ threatened victim if s/he reported? [ ] This incident [ ] In the past [x] No
Victim's view of future DV assault? [ ] Not likely to recur [x] Uncertain [ ] Likely to recur

| # Prior Reported Incidents | | # Unreported Incidents | | Date of last Incident | | Police Agencies Involved in Past | |
|---|---|---|---|---|---|---|---|

## Children

Child(ren) within sight/sound of incident? ☐ Yes (complete information below) ☑ No ☐ Unknown ☐ N/A   **Children left in the custody of**

Child(ren) assaulted/injured during incident? ☐ Yes (document in narrative) ☑ No ☐ Unknown ☐ N/A

Statement taken from child(ren)? ☐ Yes ☐ No ☑ N/A

Photos taken of child(ren)? ☐ Yes ☑ No   **CPS referral made?** ☐ Yes ☐ No   **Prior CPS involvement?** ☐ Yes ☐ No ☑ Unknown

| Child's Name (Last, First, Middle) | Sex | DOB | Child's Location During Incident | Officer's Observation of Child | Suspect's Relationship to Child |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

## Court Order Information

Current court order? ☐ Yes ☑ No ☐ Unknown   **Two or more court order violations/convictions?** ☐ Yes ☐ No ☐ Unknown

## Firearms/Weapons

1. Does suspect possess, own, or have access to firearms/weapons? ☐ Yes (describe below) ☐ No ☑ Unknown

2. Does suspect have a Concealed Pistol License (CPL)? ☐ Yes ☐ No ☑ Unknown

3. Has suspect ever been court-ordered to surrender firearms/weapons? ☐ Yes ☐ No ☑ Unknown

4. Where are the firearms/weapons (e.g. residence, vehicle, with suspect, with friend or relative)?

5. Were firearms/weapons used in current incident? ☐ Yes (describe how used in narrative) ☐ **Firearms loaded?** ☐ Yes ☑ No ☐ Unknown

6. Has suspect used/threatened to use firearms in the past against victim or others? ☐ Yes (document in narrative) ☑ No

7. Does victim or others in the home have access to firearms? ☐ Yes (document in narrative) ☑ No

8. Are there any firearms that should be temporarily removed for safekeeping? ☐ Yes ☑ No

9. If firearms used in current incident, were they recovered? ☐ Yes ☑ No   **Placed into evidence?** ☐ Yes (see evid. sheet) ☑ No

**Description of any firearms or weapons owned/possessed/registered by suspect:**

| | Removed? ☐ Yes ☐ No |
|---|---|
| | Removed? ☐ Yes ☐ No |
| | Removed? ☐ Yes ☐ No |

**\*If valid NCO/Protection Order or suspect has prior DV conviction, firearm possession prohibited per Federal/State law\***

## Injuries/Pain Diagram

Officer to mark the location of any injuries, complaint of pain or unwanted contact and describe in detail

**Have victim initial:**

_____ I have physically pointed out to the officer/s where I was injured/felt pain

_____ I have indicated on the diagram where I was injured/felt pain

_____ I was able to tell the officer/s who injured me/caused me pain

**Victim**



**"I declare under penalty of perjury under the laws of the state of Washington that the above statements are true and correct."**

Victim Signature          Officer Signature          Location (City, State)          Date

Victim   ☐ Provided recorded statement   ☐ Provided written statement – See continuation page for written/signed statement.
☐ Refused to provide written/recorded statement. Document all victim statements in incident report.

# Report Number 2020-252740 - Supplement - 2 Report

| REPORT DATE / TIME | CAD EVENT START DATE / TIME - CAD EVENT END DATE / TIME | REPORT WRITER |
|---|---|---|
| Aug 28, 2020 20:20 | Aug 28, 2020 18:36 - 19:14 | PETE CAVINTA #6246 |

SUPPLEMENT TYPE

**Booking Return**

LEGACY DATA

Charge 1: ASSAULT 4 DV                              Charge 2: ASSAULT 4 DV (MHC)

## NARRATIVE

Officers were dispatched to a domestic violence assault at ▉▉ 44 Ave. SW in the city of Seattle. Suspect Raquel Reynolds arrived at the home when suspect and her sister argued which escalated in a physical confrontation to retain a box that the suspect removed from the home. Both parties struggled over the box. Victim suffered minor visible injuries to her arm when she stated that her sister suspect grabbed her arm and forcefully pulled her back as victim tried to lean and get away from suspect. Victim suffered minor visible scratch and complained of pain to her wrist. Suspect said the victim also assaulted her, but she was not consistent with the assault that occurred from the victim. There were no visible marks to suspects body.

## INVOLVED PERSONS

| INVOLVED PERSON-1 NAME (LAST, FIRST MIDDLE) | DOB / ESTIMATED AGE RANGE |
|---|---|
| P-1 REYNOLDS, RAQUEL | 1969-04-02 |

| SEX | RACE / ETHNICITY | PHONE NUMBER |
|---|---|---|
| Female | White / Not Hispanic Or Latino | (206) 258-1000 (Home), (425) 200-4060 (Mobile) |

HOME ADDRESS

**5642 42, SEATTLE, WA 98136**

This report was generated in Mark43 and the e-signature was affixed using the undersigned officer's unique login and password. I certify (or declare) under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct to the best of my knowledge and belief.

| ELECTRONICALLY SIGNED | DATE | PLACE |
|---|---|---|
| PETE CAVINTA | 08/28/2020 | Seattle, WA |

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| PETE CAVINTA #6246   Aug 28, 2020 20:20 (e-signature) | Booking Returns Integration #BOOKING   Aug 28, 2020 20:20 (e-signature) |
| PRINT NAME | PRINT NAME |
| PETE CAVINTA #6246 | Booking Returns Integration #BOOKING |

**Seattle Police Department**                                                                                                        Pg 1 of 1
Mark43 RMS Form v2.0 generated by D. COLUMBO #7334 on Oct 29, 2020 05:08.
Imported Report

## CASE NOTE - ADDITIONAL CHARGE

| CASE STATUS | ASSIGNED UNIT | |
|---|---|---|
| **Arrest** | **Domestic Violence-Misdemeanor** | |
| ASSIGNEE | ASSISTING INVESTIGATOR(S) | |
| | | |
| AUTHOR | DATE / TIME MODIFIED | DATE / TIME CREATED |
| **JOEY F FLORES** | **09/23/2020 09:18** | **09/23/2020 09:16** |
| LOCATION TAG | | |

REYNOLDS, RAQUEL

BA 220013545

PCN 202375936

### ADDITIONAL CHARGE

CASE 656165

9A.36.041D ASSAULT 4 DV

Reset Form



# Seattle Police Department
## Sergeant Arrest Screening

**INSTRUCTIONS:** Fill out this form and save it as a PDF.

**Date** 8/28/2020   **Time** 2042

**Location** California Av SW/SW Findlay St

**Officers Involved**

Guzman, Fischer, Barreto, Cavinta, Kim

**Name of Subject(s) Arrested or Detained**

Reynolds, Raquel

**Disposition of Subject**   Booked
*If other, describe:*

**Warrant Arrest?**   None
*If not warrant arrest, crime arrested for:*

DV Assault

**Screening Captured on:**   DICVS   Yes

Body Cam   Yes

**Observed Subject in Person?**   Yes
*If not, explain:*

Any Injuries Observed?　　　　No　　　[▼]

*If so, describe:*

```
```

Subject Reported Injuries or Medical Condition?　　Yes　　[▼]

*If so, describe:*

Subj reported nerve damage from back in February that was causing her pain.

SFD Called?　　No　　[▼]

*If so, unit responding:*

```
```

If injuries were observed or reported, did they occur before the arrest detention?

Yes　　[▼]

Did the subject or any involved officer report use of force?

No　　[▼]

If so, was the use of force packet completed?

N/A

Was any suspect arrested for assaulting an officer?　　No　　[▼]

*If yes, name of lieutenant screening the assault on the officer arrest:*

```
```

Additional Information:

Subj reported hand cuff discomfort.
OTR.



**EXHIBIT 4**

# IN THE MUNICIPAL COURT OF THE CITY OF SEATTLE

THE CITY OF SEATTLE, PLAINTIFF

vs

## REYNOLDS, RAQUEL, DEFENDANT

**Notice of Charges Pending
(Clerk's Action Required: NCF)**
DOMESTIC VIOLENCE

CASE #: 656165



---

### Notice to the Defendant:

The Seattle City Attorney's office is not filing criminal charges against you at this time. You will be released today without conditions. However, the City Attorney's office may file charges against you in the future in accordance with the laws of the State of Washington. Should the City Attorney file charges at a later date, a summons to appear will be mailed to your last known address and if you fail to appear at the hearing a warrant may be issued for your arrest. Please keep your address updated with the Washington Department of Licensing by going to their website at www.dol.wa.gov, and with Seattle Municipal Court by calling 206-684-5600, Monday through Friday, 8:00am – 5:00pm (closed on holidays).

---

*To be completed by the Seattle City Attorney's Office:*

Date:               8/29/2020
CAO Clerk:          TDR
Incident #:         20-252740
Officer:            PETE CAVINTA JR.
Serial #:           6246
Dispo Date:         8/29/2020
Assistant City Attorney: Christine M Chin
Case # / Comments: _____

---

Seattle Municipal Court, Seattle Justice Center, 600 5th Avenue, P.O. Box 34987, Seattle, WA  98124-4987
TTY (Hearing & Speech Impaired) 684-5210

NCF September 2015

Operator: 911 what's your emergency?
Maria: Uh, my sister's outside and she's being abusive.
O: What's the address ...Southwest is that right?
M: yes.
O: OK
M: Seattle.
O: And she's outside?
M: She is taking things that are mine from the house she usually does this I tried to take it back
she grabbed me by the arm and she wouldn't let me go it was just an empty box.
O: OK
M: but it's mine and I thought there was something in it.
O: OK.
M: I don't know what she has.
O: Is she known to carry any guns knives or anything like that?
M: She used to, she used to carry guns.
O: oh, OK got it and has she mentioned brandbanishing them at you today?
M: No, she just grabbed me by the arm and she wouldn't let go.
O: Are you injured or do you need a medic?
M: Um, my arm is a little swollen but it's fine.
O: No medics for now?
M: No.
O: OK. what is she wearing what color shirt or jacket?
M: She's wearing a striped,
O: Uh huh.
M: white and black shirt, or white and blue shirt and she's wearing black shorts.
O: What race and age is she?
M: She's Hispanic and she's 50, 50 years old.
O: Is she thin, medium or heavy set?
M: She's thin.
O: You're doing real good.
M: 5' 10 or 5' 8.
O: Ok, anybody else home with the 2 of you?
M: I don't know I think my brother might be around here, he's dangerous.
O: Why is he dangerous?
M: I saw him around here earlier.
O: OK what makes him dangerous?
M: Um, he's an alcoholic,
O: Uh huh.
M: and he's dangerous.
O: Has he hurt anybody?
M: Has he hurt anybody today?
O: Uh huh
M: No.
O: OK....
M: I don't even see him anymore he may have left.
O: I'm trying to figure out why you would feel that way.
M: He, I've known him my whole life. He's always been dangerous.  He used to kick kittens to
death,
O: OK got it and what's his name?
M: just to see my reaction.
O: Uh huh, What's his name?
M: he's still here. his name is Enrique Martinez.
O: Enrique Martinez, OK you're doing a great job.  Anybody drinking or using drugs today?
M: Not that I know of. (2:30)
O: OK and do you have any weapons yourself ma'am?
.............

...... till we get there OK? What room are you in?

M: Um, I'm in my room.

O: Uh huh, your room in the house?

M: in the bedroom.

O: Anybody else share that room with you?

M: No.

O: OK And is she outside, where? Is still out in the yard?

M: she's in the front.

O: Uh huh,

M: by her car, by my parents car.

O: Ok. and what kind of vehicle is that?

M: it's a red Nissan Maxima.

O: red Nissan Maxima out front and where is your brother?

M: I think he's in front with her as well.

O: like out front? OK got it. You just stay on the line and let me know if anything changes, OK?

M: OK.

O: Has this ever happened with your sister before?

M: (sigh)She has been coming in and stealing things for the whole 2 years that I've lived here.

O: Uh huh

M: Uh, like there's nothing I can do about it except I keep everything locked in my room. So there was this one box downstairs. I should have just let her have it but I wasn't sure what was in it. So.

O: OK.(pause) (3:58) Just bear with me OK let me know if anything changes at all, until they come to the door where you are. where is your bedroom? Is it upstairs? Or on the main level?

M: It's in the main floor.

O: Ok

M: They'll probably see her in the front and talk to her first.

O: Uh huh, possibly, but I just wanna might make sure. (4:15). Do you remember what Enrique is wearing?

M: Yeah he's wearing like jeans and a beige colored, light green shirt and a cap and he's wearing a mask around his neck.

O: OK, is it like a ball cap?

M: Um, I think so.

O: OK. you're doing a great job, and they're coming as quick as they can OK, get you guys all safe.


M: I just want her to go back to her house! she owns this house but she doesn't live here, she lives with my parents they both live with my parents! they, um, (5:00) they just, they're hoarders and they all live there in this big, they live there in this big house filled with junk. Now they're coming here and she just can't stop hoarding so she steals things of mine. But I don't know what, I don't know what exactly.

O: Do you have any idea what they're going to get?

M: She's going she's going in the basement and cleaning it I guess, cuz there is so much garbage in there.

O: Uh huh.

(Pause)

M: so....I'm just so tired of her coming over here and abusing me, and stealing things, and you know she's trying to create drama because she's supposed to be living here. (6:00)

O: Umhmm.

M: But she doesn't want to live here.

O: How does she get in?

M: She wants to rent the house out but she's not supposed to rent it, according to the mortgage that she has for disabled people.

O: Uh huh, how did she get in? does she have a key?

M: yes she has keys to everything.

O: Ok.

M: she changed the locks so that no one can get in the front door.

O: Including you?

M: What?

O: Including you?

M: Right, well, she has a board that she boards up the front stairs so no one can get in the front. The only way to get in is through the back door.

O: Umhmm.

O: And so you think that she is going to be outside of the back door when we get there?

M: no she's in the front still.

O: OK. so she she won't, (sigh) she won't, uh, let me get mail here. She told the Post Office not to deliver my mail. And I went to the Post Office and asked and they said we can't do anything because she owns the house. She doesn't even live here. (7:00) And she canceled the garbage service. She won't let me use the garbage service. She won't, she canceled the puget sound energy so it's in my name now.

O: Umhmmm.

M: I think my dad is paying the water bill and the electric bill.

O: Oh my goodness.

M: I don't know anymore what's going on who's paying what, um, but I got a notice saying that the power, or the gas was going to be cut off so I had to get that put in my name.

O: Umhmm.

M: She is supposed to be living here according to the mortgage but she doesn't want to live here, she wants to live with her, my parents.

O: And how far away is that?

M: 6 blocks.

O: Umhmm, So not far?

M: no. so she comes over every day.

O: And just shows up? And starts going through things?

M: She does things like, you know she'll do the yard work, or she'll move things, or start to move my things in the kitchen, take things out of the kitchen, take them back home with her. (8:02) She acts like she lives here. She tells people she lives here. She doesn't. She lives with my parents. They have a 4 story house, one of those quad levels.

O: Umhmm.

M: She has it filled to the rafters with her stuff.

O: Oh my.

M: Cuz she can't get rid of anything.

O: And your parents are OK with that?

M: They are in their eighties and they're just, they can't, they can't do anything about it they're just.

O: And so does she.......in this house to get more stuff? Or to get rid of stuff?

M: Yeah she comes and gets more stuff! I don't know what she does with it all!

O: Interesting. (8:40)

M: She has a bunch, she has one room here. The master suite here. It's locked. She's got that full of stuff.

O: Umhmm.

M: And she's got the basement full of stuff.

O: Oh goodness.

M: If I leave any of my things out in the, in the living room, she steals them. She just takes them.

O: I wonder what she does with them.

M: I've taken videos.

O: Have you ever asked her? (9:00)

M: I've taken videos.

M: No, I've seen the house. I know. It's just filled, its just filled to the rafters. Literally. It's got a 3 car garage all those filled to the top.

O: Interesting.

M: Then its it's got, you know, lining the hallways to her room all. She sleeps with things. She sleeps with junk on her bed.

O: Well that can't be very comfortable.
She just, she can't get rid of anything.
(9:30)
M: I have to live in this one bedroom with all of my things in 1 bedroom because if I leave it outside she steals it.
O: Could you move somewhere else that she doesn't have access to?
M: I've been sick and so the whole point, I got sick in 2014.
O: Uhhuh.
M: And I ended up on my parents' couch and I knew her husband was going to divorce her. I, I told her in 2009 but 2014 she shows up, and he just dumped her and told her he wanted a divorce, and, so she moved in there (10:00) and I helped her for 3 years with her divorce so that she wasn't left with nothing. And the deal was I would help her get this house, she has no job no work history,
O: Um hmmm.
M: and I told her I would help her get this house. And I did. And I got her the 2nd mortgage is 30 years, no, no payments and, it's just you know the 2nd mortgage,
O: Umhmm,
M: And it's for $30000 she doesn't have to pay anything, and, the deal was that we were going to live here together.
O: Hmhmmm.
M: and if she would take care of me, cuz I'm ........ she wanted me to just move out not live anywhere. She wanted to rent this house.
O: Hmhmmm...But she's not supposed to because of mortgage, yeah.
M: So the deal with the mortgage she supposed to live here and she doesn't.  So I just kept living here but she's just so abusive, and I can't move cuz I'm too sick to work or do anything.
O: Hmhmmm.
M: So I started enrolling in school, going to classes.
O: Good for you.
M: And I have couple of years left.
O: What kind of classes are you taking? (11:00)
M: I just got accepted to the Udub. Um,  So I'm going to major in The Comparative History of Ideas but before this I was going to try for computer science degree but it's too hard, so I switched.
O: It's hard to learn with computer stuff.  It's like a different language.
M: And you have to get a 3.8 or above to make into the Paul Allen school.
O: Uh Huh.
M: So I'm at a 3.6 and there was no way that I could make it and I couldn't do better than that.
O: That's still darn good.
M: Um, not good enough for computer science, so, liberal, you know, huh, humanity degree, liberal arts, is easier.
O: Hmhmmm.
M: And while I'm sick I can just do that.
O: Yeah, good call. Good call, all right, so it looks like Officers have arrived. Why don't you stay put inside until they knock on the door OK?
M: Ok.
O: All right.
M: But they can't come up the front they have to come over the back because,
O: Ok.
M: Well, she might (12:00) she might let them come in the front. I don't know.
O: Yea, we'll find you. Or they'll call you and have you come out, OK?
M: OK.
O: All right you take care.
M: I don't see them.
M: OK bye.
O: All right bye.
M: Thank you.

# EXHIBIT 6

UNITED STATES OF AMERICA, Plaintiff, v. CITY OF SEATTLE, Defendant.

ERIC H. HOLDER, JR. Attorney General of the United States of America JENNY A. DURKAN United States Attorney for the Western District of Washington Kerry J. Keefe, Civil Chief J. Michael Diaz, Assistant United States Attorney Rebecca S. Cohen, Assistant United States Attorney For the CITY OF SEATTLE: PETER S. HOLMES Seattle City Attorney PETER S. HOLMES, Seattle City Attorney JEAN BOLER, Civil Chief SARAH K. MOREITEAD THOMAS E. PEREZ Assistant Attorney General Civil Rights Division Jonathan M. Smith, Chief Timothy D. Mygatt, Special Counsel Michelle L. Leung, Trial Attorney Michael J. Songer, Trial Attorney United States Department of Justice Civil Rights Division- Special Lit. Section

James L. Robart

The Honorable James L. Robart

STIPULATION AND JOINT [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

Please Note on Motion Calendar for: August 17, 2012

Pursuant to Fed. R. Civ. P. 52, the City of Seattle ("the City") and the United States of America ("the United States") (collectively "the Parties") hereby stipulate to, and jointly and respectfully submit, the following [Proposed] Findings of Fact and Conclusions of Law.

**[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**I. INTRODUCTION**

The Parties' (1) Joint Motion and [Proposed] Order for Approval of Settlement Agreement and Stipulated Order of Resolution and Entry of Judgment (Dkt. No. 3, filed July 27, 2012, "Joint Motion") and (2) Stipulation and Joint [Proposed] Findings of Facts and Conclusions of Law (Dkt. No. 5, filed August 17, 2012) were heard in open court on August 24, 2012 before the Honorable James L. Robart, United States District Court Judge. Having considered the foregoing and all the documents in the record, including but not limited to the  Complaint (Dkt. No. 1), and its exhibit thereto (Dkt. No. 1-1, adopted by reference pursuant to Fed. R. Civ. P. 10(c)); having heard and considered the argument of counsel at the publicly-noticed, above-referenced hearing; having further considered the pertinent governing law; and having reviewed the facts and records of this action, the Court makes the following findings of fact and conclusions of law, pursuant to Fed. R. Civ. P. 52(a)(3);

**II. FINDINGS OF FACT**

1. On March 31, 2011, the United States' Department of Justice ("DOJ") publicly announced that it had begun an investigation of the Seattle Police Department ("SPD") pursuant to, *inter alia,* the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 ("Section 14141"). DOJ's investigative team consisted of lawyers and other staff from the Civil Rights Division and the United States Attorney's Office for the Western District of Washington, working closely with policing consultants.

2. The City and SPD fully cooperated with the investigation.

3. During this nine-month investigation, DOJ and its police experts gathered information through interviews and meetings with SPD officers, supervisors, and command staff, representatives of the Seattle Police Officers' Guild and Seattle Police Management Association, members of the public, City and State officials, and other community stakeholders. The investigation also included on and off-site review of documents, and on-site tours in which DOJ personnel and experts accompanied SPD officers during their shifts.

4. As part of the investigation, DOJ received or reviewed hundreds of thousands of pages of documents, including SPD policies and procedures, training materials, SPD's internal use of force reports, SPD's public reports, files from SPD's Office of Professional Accountability ("OPA"), and community and other publicly available documents, as well as video and other data generated from SPD and OPA databases.

5. The investigation also included hundreds of interviews and meetings with SPD officers, supervisors, command staff, its Auditors past and present, and representatives of the Seattle Police Officers' Guild and Seattle Police Management Association, as well as Seattle City officials, local community advocates and attorneys, and members of the Seattle community at large. DOJ hosted multiple full days of interviews with community members.

6. On December 16, 2011, DOJ released its report ("DOJ Report," Dkt. No. 1-1) announcing that it had found reasonable cause, under Section 14141, to believe that SPD had engaged in a pattern or practice of excessive force. Specifically, the 67-page DOJ Report asserted that SPD had engaged in unjustified use of impact weapons, unjustified escalation of minor encounters into force events particularly against individuals with mental illness or those under the influence of alcohol or drugs, unjustified use of force against persons who were restrained or simply exercising their First Amendment rights, and unjustified use of force by multiple officers. The DOJ Report also asserted that this pattern or practice of using unlawful force derived from SPD's systematic failure to implement adequate policies, procedures, training, and oversight.

7. Although DOJ did not make a finding that SPD engages in a pattern or practice of discriminatory policing, the DOJ Report identified DOJ's serious concerns about certain practices that could have a disparate impact on minority communities and could support allegations of discriminatory policing, including the DOJ finding that over half of the excessive force cases identified by DOJ involved minorities. The United States asserts that many of the issues related to discriminatory policing are both aggravated by and contribute to the issues regarding the excessive use of force.

8. The City disputed the findings in the DOJ Report. The City did not admit that any complaint reviewed by DOJ was meritorious or improperly addressed by SPD. The parties agreed that nothing in the settlement agreement or the negotiations would be construed as an admission of wrongdoing by the City or evidence of liability under any federal, state or municipal law.

9. Based on its investigation, DOJ believed it was authorized, under Section 14141, to file a civil action to obtain appropriate equitable and declaratory relief to eliminate the alleged pattern or practice of unlawful use of force, and did initiate a lawsuit pursuant to Section 14141 in this Court (Dkt. No. 1).

10. Shortly after DOJ issued its Report, the Parties began negotiations to resolve the United States' concerns without the need to resort to contested litigation.

11. In January and February 2012, DOJ met with the City's elected officials, including its Mayor, City Attorney, and City Council. During the course of approximately seven months, the Parties conducted extensive negotiations over potential revisions to SPD's policies, procedures, and supervisory practices that would prevent a pattern or practice of constitutional violations as alleged by the United States.

12. On March 30, 2012, the United States provided the City with its draft proposed Reform Plan. The City responded with its counter-proposal on May 16, 2012. The Parties subsequently exchanged multiple drafts of proposals and counter-proposals and conducted numerous negotiating sessions. The parties then engaged a professional, licensed mediator who facilitated approximately 100 hours of intense, contested negotiations, which yielded the Settlement Agreement and Stipulated Order of Resolution ("Agreement and Stipulated Order," Dkt. 2-1), filed in this Court on July 27, 2012.

13. During this process, both the United States and the City consulted with subject matter experts, both internal and external, to ensure that the remedial measures in the Agreement and Stipulated Order are tailored to address the specific concerns identified by DOJ and can be reasonably implemented by SPD. SPD command staff, OPA, and other SPD personnel assisted in crafting the Agreement and Stipulated Order and in resolving potential adverse operational impacts.

14. The Parties are sophisticated and were represented by experienced counsel. The parties are intimately familiar with SPD's policies and practices and invested significant time negotiating the Agreement and Stipulated Order.

15. Additionally, since the beginning of 2012, DOJ conducted extensive outreach to SPD, its officers, supervisors, and command staff, the Seattle Police Officers' Guild and Seattle Police Management Association, and OPA and its former and current civilian Auditors. *See* Declaration of J. Michael Diaz, filed herewith. Both parties reached out to members of the public, City and State officials, and many community stakeholders, including community advocacy organizations, and minority and ethnic community organizations. *Id.* The Parties received multiple detailed written recommendations from community organizations. *Id.* Through this outreach, the Parties sought to solicit and did incorporate, as appropriate, the input of individuals and organizations into the Agreement and Stipulated Order. *Id.*

16. The express purpose of the Agreement and Stipulated Order was to resolve the litigation filed by the United States and to ensure that police services are delivered to the Seattle community in a manner that fully complies with the Constitution and laws of the United States. Although the City denies the existence of any pattern or practice of unconstitutional conduct by SPD and its officers, it entered into the Agreement and Stipulated Order with the goal of ensuring that SPD's policies, procedures, training, and oversight are sufficient to prevent practices that the United States alleges contributed to a pattern or practice of constitutional violations. The City also entered into the Agreements because it wishes to ensure that its police department is functioning at an exceptional level and that it has positive relationships with all of its communities.

17. The Agreement and Stipulated Order's substantive provisions relate directly to the policies, procedures, training, and oversight that the United States alleges contribute to a pattern or practice of SPD officers using excessive force in violation of the Fourth Amendment and Section 14141. For instance, the Agreement and Stipulated Order requires the City and SPD to address policies and training related to: use of force, including use of impact weapons, escalation of minor encounters, and force used against individuals with mental illness; discriminatory policing; and front line and supervisory

review of the use of force. The Agreement and Stipulated Order also includes ongoing mechanisms to solicit input from SPD officers and members of the Seattle community.

18. Voluntary and mutually agreeable implementation of reforms is more likely to conserve public resources and result in beneficial change than the uncertainties of litigation or an order of this Court imposed at the end of protracted litigation.

19. On July 31, 2012, the Court published on a publicly-accessible website notice of the August 24, 2012 hearing to review the Joint Motion for Approval of the Settlement Agreement and Stipulated Order of Resolution and Entry of Judgment and posted a copy of the Complaint and Exhibit 1 (Investigation of the Seattle Police Department), and the Joint Motion for Approval of Settlement Agreement and Exhibit A (Settlement Agreement).

## III. CONCLUSIONS OF LAW

20. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345. Venue is proper in the Western District of Washington pursuant to 28 U.S.C. § 1391(b). Defendant is a municipal corporation located in this district, and a substantial part of the alleged events giving rise to this action occurred within this district in Seattle.

21. Public policy favors settlement, particularly in complex litigation such as the pattern or practice claim brought by the United States here. *Officers for Justice* v. *Civil Service Comm'n,* 688 F.2d 615, 625 (9th Cir. 1982), *cert, denied,* 459 U.S. 1217 (1983) ("[I]t must not be overlooked that voluntary conciliation and settlement are the preferred means of dispute resolution."); *United States v. North Carolina,* 180 F.3d 574, 581 (4th Cir. 1999) ("In considering whether to enter a proposed consent decree, a district court should be guided by the general principle that settlements are encouraged."). Indeed, this Court very recently has held the same. *Arthur, et al. v. Sallie Mae, Inc., et al.,* No. CV10-198-JLR, 2012 U.S. Dist. LEXIS 3313, at *17-18 (W.D. Wash. Jan. 10, 2012) ("As a matter of express public policy, federal courts strongly favor and encourage settlements, particularly in class actions and other complex matters.").

22. To assess whether to approve a proposed settlement, courts consider whether the settlement is "fundamentally fair, adequate, and reasonable." *United States v. Oregon,* 913 F.2d 576, 580 (9th Cir. 1990); *see also Cemex Inc. v. Los Angeles County,* 166 Fed. App'x 306, 307 (9th Cir. 2006) ("Review of a consent decree is limited to ensuring that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned").

23. This analysis does not require "the achievement of the optimal outcome for all parties," but rather "[t]he court need only be satisfied that the decree represents a reasonable factual and legal determination." *Oregon,* 913 F.2d at 580-81. Indeed, the court's approval "is nothing more than an amalgam of delicate balancing, gross approximations and rough justice." *Officers for Justice,* 688 F.2d at 625. In addition to considering the overall scope of the agreement, courts make this "gross approximation" by considering whether the agreement is consistent with the law, whether it was forged by arms-length bargaining, and whether there is an evidentiary basis supporting its provisions. *North Carolina,* 180 F.3d at 581.

24. Congress enacted Section 14141 to forbid law enforcement officers from engaging in a pattern or practice "that deprives persons of rights, privileges, or immunities secured or protected by the

Constitution or laws of the United States." 42 U.S.C. § 14141(a). It contains no limitation on the nature of the constitutional or federal rights that it protects. Whenever the Attorney General has reasonable cause to believe that a pattern or practice of constitutional or statutory violations exists, Congress granted DOJ the authority to initiate a civil lawsuit to eliminate the pattern or practice. 42 U.S.C. § 14141(b).

25. The Agreement and Stipulated Order is tailored to the alleged deficiencies identified by the United States. Accordingly, and additionally, it is consistent with and furthers the objectives of Section 14141 because it embodies the agreement of the City and commitment of its police department to ensure that no pattern or practice of unconstitutional police conduct exists.

26. The negotiations that culminated in the Agreement and Stipulated Order were arms-length, not the product of fraud or overreaching by, or collusion between, the Parties. Such negotiations underscore the reasonableness of the Agreement and Stipulated Order.

27. There is an evidentiary basis for the Agreement and Stipulated Order, including but not limited to the United States' investigation, and the input of many members of the community.

28. Through, in part, the Parties' extensive outreach to the City and its various diverse communities, the Agreement and Stipulated Order is fair and adequately addresses the interests of all concerned.

29. "Because of the consensual nature of [such an agreement], voluntary compliance is rendered more likely . . . . At the same time, the parties . . . minimize costly litigation and adverse publicity and avoid the collateral effects of adjudicated guilt." *United States v. City of Jackson, Miss.,* 519 F.2d 1147, 1152 n.9 (5th Cir. 1975). Indeed, "the value of voluntary compliance is doubly important when it is a public employer that acts, both because of the example its voluntary assumption of responsibility sets and because the remediation of governmental discrimination is of unique importance." *Wygant v. Jackson Bd. of Educ., 476* U.S. 267, 290 (1986) (O'Connor, J., concurring).

30. "Rule 52(c) provides the court may enter judgment after a party has been 'fully heard.' ... The court was not required to receive live testimony." *Granite State Ins. Co.* v. *Smart Modular Techs.,* 76 F.3d 1023, 1031 (9th Cir. 1996).

31. In sum, entry of the Agreement and Stipulated Order is appropriate because, taken as a whole, the Agreement and Stipulated Order is fundamentally fair, adequate, and reasonable, resulted from arms-length negotiations by sophisticated parties, is consistent with the purpose of Section 14141, supported by an evidentiary record; and is the most effective way to address the allegations of unconstitutional policing made by the United States.

32. To the extent that any of the foregoing Findings of Fact are deemed to be Conclusions of Law (or vice versa), they are incorporated into these Conclusions of Law (or vice versa).

So stipulated and respectfully and jointly submitted on August 17, 2012. For the UNITED STATES OF AMERICA: ERIC H. HOLDER, JR.
Attorney General of the United States of America
JENNY A. DURKAN
United States Attorney for the
Western District of Washington

_____
Kerry J. Keefe, Civil Chief
J. Michael Diaz, Assistant United States Attorney
Rebecca S. Cohen, Assistant United States Attorney
For the CITY OF SEATTLE: PETER S. HOLMES
Seattle City Attorney

_____
PETER S. HOLMES, Seattle City Attorney
JEAN BOLER, Civil Chief
SARAH K. MOREITEAD
THOMAS E. PEREZ
Assistant Attorney General
Civil Rights Division

_____
Jonathan M. Smith, Chief
Timothy D. Mygatt, Special Counsel
Michelle L. Leung, Trial Attorney
Michael J. Songer, Trial Attorney
United States Department of Justice
Civil Rights Division- Special Lit. Section

## [PROPOSED] ORDER APPROVING

## THE JOINT FINDINGS OF FACT AND CONCLUSIONS OF LAW

AND NOW, this 21st day of Sept, 2012, upon consideration of the foregoing, the Findings of Fact and Conclusions of Law are APPROVED and ENTERED in this matter in the above-agreed form. Approval of the Settlement Agreement and Entry of Judgment shall be set out in a separate document.

_____

Hon. James L. Robart

United States District Court Judge

Saying someone's Mexican is not a racial slur, said one man.

And there was this verbal exchange.

People define themselves. I define myself. You don t define me, said a man, speaking English with an accent.

If you speak English, I could understand you. I don't know what you're saying, said a counter-protester.

2021?

**In a video shot April 17, 2010, a Seattle police officer is heard swearing and using a racial comment at a robbery suspect. Later, he was seen stomping on the man's hand and another officer is seen stomping on his leg. Officers later determined the man was not their suspect and he was released.**

Author: KING Staff

Updated: 2:08 AM PDT May 19, 2010

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON DIVISION THREE STATE OF WASHINGTON, Respondent, v. KENNETH LEROY STEPHENS, Appellant. ) ) ) ) ) ) ) ) ) No. 36542-5-III (2020) UNPUBLISHED OPINION FEARING, J. — This appeal asks when is an arrest an arrest? A law enforcement officer handcuffed appellant Kenneth Stephens and advised him of his Miranda rights, then questioned Stephens before informing him he was under arrest. Stephens contends the officer arrested him before questioning him and that a statement confessing to theft must be suppressed in addition to methamphetamine found during a search incident to arrest. The State argues that the arrest occurred only after the officer announced the arrest. We agree with Stephens and reverse his conviction for possession of a controlled substance.

First, the trial court erred when refusing to suppress the evidence of the methamphetamine found on his person because Officer Albert Gonzalez arrested him before questioning him and Gonzalez lacked probable cause to arrest him.

We encounter limited difficulty in discerning the law of arrest because of loose terminology used in court opinions. The law uses many and often overlapping terms for various interactions between a law enforcement officer and a suspect or for that matter any citizen regardless of suspect designation. The words and expressions include "social contact," "stop," "investigative stop," "brief investigative stop," "stop and frisk," "Terry stop," "Terry investigative stop," "detainment" "detention," "limited detention," "involuntary detention," "investigatory detention," "brief, investigative detention," "seizure," "present confinement," "restraint," "physical restraint," "physical intrusion," "arrest," "custody," "custodial arrest," "full custodial arrest," and "formal arrest." State v. Mecham, 186 Wn.2d 128, 138, 380 P.3d 414 (2016); State v. Flores, 186 Wn.2d 506, 512 (2016); State v. Patton, 167 Wn.2d 379, 387, 219 P.3d 651 (2009); State v. Reichenbach, 153 Wn.2d 126, 135, 101 P.3d 80 (2004); State v. Lorenz, 152 Wn.2d 22, 36-37, 93 P.3d No. 36542-5-III State v. Stephens 8 133 (2004); State v. Acrey, 148 Wn.2d at 746 (2003); State v. Kennedy, 107 Wn.2d 1, 4, 726 P.2d 445 (1986); State v. Rupe, 101 Wn.2d 664, 683-84, 683 P.2d 571 (1984); State v. Marcum, 149 Wn. App. 894, 902-03, 910, 205 P.3d 969 (2009); State v. Salinas, 169 Wn. App. 210, 217, 279 P.3d 917 (2012); State v. Gering, 146 Wn. App. 564, 566-67, 192 P.3d 935 (2008); State v. Radka, 120 Wn. App. 43, 48-50, 83 P.3d 1038 (2004). For purposes of our analysis, we label any contact between the officer and a citizen that restrains the citizen's movement or seeks to restrain the citizen's movement a "seizure," since

the Fourth Amendment to the United States Constitution employs the word. In turn, we pigeonhole an officer's seizure of a suspect such that the seizure requires probable cause as an "arrest." Finally, we categorize an officer's temporary seizure of a suspect such that the seizure demands only a reasonable articulable suspicion as an "investigatory stop." We explore below the parameters of the distinction between an investigatory stop and an arrest, although one court impliedly suggested placing the plow before the mule by focusing on whether we believe the officer should have had probable cause before restraining and questioning the suspect and then deciding whether the suspect was under arrest based on our desire as to whether the officer should have had probable cause. State v. Williams, 102 Wn.2d 733, 739-40, 689 P.2d 1065 (1984).

Based on both the federal and state constitutions, Washington recognizes, at least in theory, almost an absolute bar to warrantless seizures. State v. Flores, 186 Wn.2d 506, 512 (2016). Officer Albert Gonzalez seized Kenneth Stephens without a warrant.

A law enforcement officer may handcuff a suspect during an investigatory stop, but generally the officer must articulate a reason for deeming the suspect dangerous or a risk of flight. State v. Williams, 102 Wn.2d 733, 740-41 (1984); State v. Cunningham, 116 Wn. App. 219, 229, 65 P.3d 325 (2003); State v. Gering, 146 Wn. App. 564, 567 (2008).

A warrantless seizure is presumed unreasonable under the Fourth Amendment. State v. Acrey, 148 Wn.2d 738, 746 (2003). Since Officer Albert Gonzalez arrested Kenneth Stephens, rather than performing an investigatory stop, the State must show that Gonzalez possessed probable cause that Stephens committed a crime. State v. Grande, 164 Wn.2d 135, 141, 187 P.3d 248 (2008). The State bears the burden of establishing probable cause. State v. Thompson, 151 Wn.2d 793, 803, 92 P.3d 228 (2004).


May 12, 2020

most often — each over 6 percentage points higher than their respective white control groups. Black subjects were searched just under 4 percentage points more often than their white counterpoints.

## Crosscut.

The high rates at which non-Whites are stopped, questioned, cited, arrested, or injured by the police present some of the most salient criminal justice policy phenomena in the United States (Kochel, Wilson, and Mastrofski, 2011; Lytle, 2014). Because these kinds of police contact are associated with at least some forms of what is known as proactive policing, recognition of this reality is an important starting point for this chapter. Additionally, because many proactive policing strategies by design increase the volume of interactions between police and the public, such strategies may increase the overall opportunity for problematic interactions that have disparate impacts.

   Concerns about the interaction between race and policing are not new. For example, researchers have been studying differential stop and arrest rates across demographic groups—and more generally, racial disparities in criminal justice involvement, offending, and the likelihood of becoming a crime victim—for several decades (see, e.g., Sampson and Lauritsen, 1997; Tonry, 1995). Nonetheless, several recent high-profile incidents of police shootings and other police–citizen interactions caught on camera and viewed widely have made questions regarding basic fairness, racial discrimination, and the excessive use of force of all forms against non-Whites in the United States a pressing national issue.

Proactive Policing: Effects on Crime and Communities (2018)

SEATTLE - The Seattle Police Department has launched a criminal investigation into last month's videotaped incident of police officers stomping on a Latino man and using racially-charged words against him.
But a new coalition of leaders for people of color in Seattle say they don't want to wait. They want the two principal officers on the tape fired now. They say the tape speaks for itself.
The April 17 incident shows Detective Shandy Cobane stomping on the hand of Martin Monetti, 21, as Monetti lay face down on the ground. Cobane is

heard yelling I'm going to beat the f---ing Mexican piss out of you homey. You feel me? Officer Mary Woollum is appears to also stomp on Monetti's leg. Other officers at the scene did not step in to stop what was happening.

The incident happened as police were searching for Latino suspects in armed robberies near the scene. Monetti was let go, but two other men were arrested.

On Tuesday, Interim Chief John Diaz announced he has put its internal investigation on hold and sent the case to the criminal division. Diaz says the investigation will look at the actions of every officer seen on the tape.

They will do that investigation like they would any other criminal investigation. They will gather evidence, interviews and they will put that package together. That package will be sent to the prosecutor's office. They will review it. They will make a final determination whether to file charges or not, said Diaz.

Asked whether having his own department conduct the investigation is a conflict of interest, Diaz said no.

We ve done this in the past. We've done it successfully. I have no reason to believe we won't do that in the future.

Diaz says he is troubled that not one officer reported the use of force and that no report was written, which is required.

Diaz says he expects to appoint a Detective Sergeant to head up the investigation in the next couple of days. Diaz says he expects this investigation to be thorough and acknowledges that it could delay the decision to discipline the officers because the administrative review won't start up again until the criminal investigation is complete.

That may not sit well with leaders of Seattle's Latino community. On Tuesday, they gathered on the steps of City Hall, along with leaders of other communities of color, to announce the formation of the Community Coalition for Law Enforcement Accountability Tuesday.

To ensure that there is zero tolerance policy with regard to discrimination, racist remarks, racial profiling and use of undue force, said Estela Ortega, executive director of El Centro de la Raza.

If one innocent among us is kicked, called racist names, meant to feel inferior because of his color, we are all kicked, said James Kelley of the Urban League.

You see we have to ask ourselves now, 'do we have to be afraid everytime we encounter a police officer?' said Luis Ortega of Alianza.

The coalition says it wants Cobane and Woollum fired. They also want the supervising sergeant who witnessed theincident but failed to report it placed on unpaid leave and the officers at the scene suspended for two weeks without pay and reassigned to desk duty

Outside City Hall, three people held a counter-protest.

# Over 200 Seattle Police Officers Quit Amid Nation Protests

The Seattle Police Department said more than 200 officers have left their jobs since last year.

By <u>Associated Press</u>

April 28, 2021, at 10:51 a.m.
Share

Over 200 Seattle Police Officers Quit Amid Nation Protests

 More

SEATTLE (AP) — The Seattle Police Department has said that more than 200 officers left their jobs since last year, citing an anti-police climate in Seattle, City Council policies and disagreements with department leadership.

Police Chief Adrian Diaz said Tuesday that the department is in a "staffing crisis" after more than 180 police officers quit last year and another 66 officers left their jobs so far this year, according to police data.

"We are at record lows in the city right now. I have about 1,080 deployable officers. This is the lowest I've seen our department," Diaz told KING-TV.

Exit interviews with departing officers revealed that some retired early, while others left for policing jobs in different cities or private sector jobs.

Activists have applauded the reductions and called for additional city police department cuts following nationwide protests over police brutality and excessive use of force targeting people of color.

Using data on NYC's Stop and Frisk program, we demonstrate that on non-lethal uses of force – putting hands on civilians (which includes slapping or grabbing) or pushing individuals into a wall or onto the ground, there are large racial differences. In the raw data, blacks and Hispanics are more than fifty percent more likely to have an interaction with police which involves any use of force. Accounting for baseline demographics such as age and gender, encounter characteristics such as whether individuals supplied identification or whether the interaction occurred in a high- or lowcrime area, or civilian behaviors does little to alter the race coefficient. Adding precinct and year fixed effects, which estimates racial differences in police use of force by restricting to variation within a given police precinct in a given year reduces the black coefficient by 19.4 percent and the ogy, to study questions such as whether police treatment of citizens impacts the broader public opinion of the police (Miller et al., 2004). 3 Hispanic coefficient by 26 percent, though both are still statistically larger than zero. Including more than 125 controls available in the data, the odds-ratio on black (resp. Hispanic) is 1.173 (resp. 1.120). Interestingly, as the intensity of force increases (e.g. handcuffing civilians without arrest, drawing or pointing a weapon, or using pepper spray or a baton), the probability that any civilian is subjected to such treatment is small, but the racial difference remains surprisingly constant.

The Seattle Police Department currently flaunts a $13.3 million line item for "homeland security." Total operating expenses for the city's 2020 streetcar system come to $11.7 million. The city has paid $6.3 million in overtime wages to police officers since widespread anti-police brutality protests began on May 30. Seattle's current annual expenditure for its Office of Civil Rights — which features dozens of volunteer appointees who advise the city council and mayor on substantial policy recommendations — is $4.6 million.

In all but stop duration, the report "solidifies findings of disparity," its authors wrote.

**Next:** In Washington politics, is it really Seattle's state now?

People of color were frisked more regularly than white people after being stopped by an officer. Hispanic subjects and people of Asian descent were searched the



## Seattle Municipal Court - Portal

*"Community Involved Justice"*      *Honorable Willie Gregory, Presiding*

| Overview |
|---|
| Courtroom Calendar |
| Defendant Search |
| Case Information |
| Case Documents |
| Attorney Search |
| Citation Information |
| Vehicle Information |
| **External Links** |
| Seattle Municipal Code |
| Revised Code of Washington |
| State of Washington Courts |
| SMC Court Rules |

Enter a case or PIN (police incident number ##-######):

539913   [ Search ]   [ Search for Defendant ]   [ View Docket ]

DefendantMARTINEZ, MARIA G     Case539913    CN

### Case Details

| | | | |
|---|---|---|---|
| Case Number: | 539913 | Defendant Name: | MARIA G MARTINEZ |
| Case Type: | CRIMINAL | Defense Attorney: | |
| Case Category: | DOMESTIC VIOLENCE | Arraignment Waiver | |
| Case Status: | CLOSED | Attorney Waiver Date: | |
| End Date | | Jurisdiction End Date: | |
| Filing Date: | 06/24/2009 | Jury Waiver Date: | |
| Total Obligation Due: | $0.00 | Police Incident Number: | 09-217755 |
| Date of Birth: | 12/29/1965 | Amount in Collection: | |
| | | Aliases: | MARIA MARTINEZ, MARIA GUADALUPE MARTINEZ |

Charges    Citations    Hearings    Events    Obligations

| Sequence | Violation Code | Violation Description | Plea | Finding | Dispo | Dismissal Reason | Close Date |
|---|---|---|---|---|---|---|---|
| 1 | 12A.06.010(A) | ASSAULT | | | NC | | 06/25/2009 |

© Copyright 1995-2010 **City of Seattle**

Privacy and Security Policy

**App v1.0.0.0, Framework v1.0.0.6**

 # Fwd: burglary video

Inbox

**Raquel Reynolds <raquel.reynolds@gmail.com>**

---------- Forwarded message ----------
From: **Bach, Scotty** <Scotty.Bach@seattle.gov>
Date: Thu, Apr 26, 2012 at 8:13 AM
Subject: RE: burglary video
To: Aaron S. Reynolds <mail@aaronreynolds.com>, Raquel Reynolds
<raquel.reynolds@gmail.com>

Oh we will find out!  What did he take?

**From:** reynoldslaw@gmail.com [mailto:reynoldslaw@gmail.com] **On Behalf Of** Aaron S. Reynolds
**Sent:** Thursday, April 26, 2012 8:08 AM
**To:** Bach, Scotty; Raquel Reynolds
**Subject:** RE: burglary video

I will if I find out. Thanks

On Apr 26, 2012 8:05 AM, "Bach, Scotty" <Scotty.Bach@seattle.gov> wrote:
Let me know who he is.... My personal phone is 206-499-1740 she can call me if she sees him.

**From:** reynoldslaw@gmail.com [mailto:reynoldslaw@gmail.com] **On Behalf Of** Aaron S. Reynolds
**Sent:** Thursday, April 26, 2012 2:06 AM
**To:** Bach, Scotty
**Subject:** burglary video

http://vimeo.com/41064349

# Fwd: Lets catch this guy! ....more snap shots

Inbox



**Raquel Reynolds <raquel.reynolds@gmail.com>**
---------- Forwarded message ----------
From: **Raquel Reynolds** <raquel.reynolds@gmail.com>
Date: Sat, Jun 2, 2012 at 8:31 PM
Subject: Lets catch this guy! ....more snap shots
To: scotty_bach@yahoo.com <scotty_bach@yahoo.com>

---------- Forwarded message ----------
From: "Raquel Reynolds" <raquel.reynolds@gmail.com>
Date: Jun 2, 2012 7:03 PM
Subject: Fwd: more snap shots
To: "Aaron" <reynoldslaw@gmail.com>



(Not all photos attached)

# Fwd: SMS with SPD Scotty

Inbox



**Raquel Reynolds <raquel.reynolds@gmail.com>**

---------- Forwarded message ---------
From: <raquel.reynolds@gmail.com>
Date: Sat, Jul 20, 2013 at 2:09 PM
Subject: SMS with SPD Scotty
To: SPD Scotty <2064991740@unknown.email>

Sorry, lost my phone in Wyoming. Now what were we talking about?

# Fwd: Call with SPD Scotty
Inbox



**Raquel Reynolds <raquel.reynolds@gmail.com>**

---------- Forwarded message ----------
From: **SPD Scotty** <2064991740@unknown.email>
Date: Thu, Apr 26, 2012 at 3:11 PM
Subject: Call with SPD Scotty
To: <raquel.reynolds@gmail.com>

Incoming call
From: 2064991740
Date: Apr 26, 2012 3:11:13 PM
Duration: 8 mins 41 secs

# Fwd: another pair of burglaries
Inbox



**Raquel Reynolds <raquel.reynolds@gmail.com>**

---------- Forwarded message ----------
From: **Raquel Reynolds** <raquel.reynolds@gmail.com>
Date: Thu, Apr 26, 2012 at 3:14 PM
Subject: Fwd: another pair of burglaries
To: <scotty_bach@yahoo.com>

---------- Forwarded message ----------
From: "Aaron S. Reynolds" <mail@aaronreynolds.com>
Date: Apr 26, 2012 12:55 PM
Subject: another pair of burglaries
To: "Raquel Reynolds" <raquel.reynolds@gmail.com>

There was one across the alley from us on the same block, same day. AND there was one on your MOMs block the same night!! see attached. Officer pat chang took the report.

**General Offense Information**

Operational status : **OPEN**
Reported on : **Apr-25-2012 (Wed.) 0142**
Occurred on : **Apr-25-2012 (Wed.) 0008**
Approved on : **Apr-25-2012 (Wed.) by : 5892 - MACCARRONE**
Report submitted by : **4617 - CHANG**
Org unit : **SOUTHWEST PCT 3RD W - WILLIAM**
Location : **50XX BLOCK OF 41ST AVE SW**
Municipality : **SEATTLE**
District : **W** Beat : **W2** Grid : **6076**
Felony/Misdemeanor : **F**

**Offenses (Completed/Attempted)**

Offense : **#1 2202 - 0 BURGLARY-FORCE-RES - COMPLETED**
Location : **RESIDENCE/HOME**
Entry Method : **FORCED ENTRY**

**\*\* END OF HARDCOPY \*\***

---

# Fwd: Monty's Bday
Inbox

**rockie rockie@unforgettable.com** <u>via</u> **gmail.com**

---------- Forwarded message ---------
From: **Wendy Moss** <ptsm_moss@hotmail.com>
Date: Thu, Aug 25, 2011 at 9:42 AM
Subject: Monty's Bday
To: Amy Emerson (Thompson) <a.thomperson@gmail.com>, Brian Holmberg
<bholmberg@carnival.com>, Dawn Baughman <emerson_dawn@hotmail.com>,
<emersoj2@gmail.com>, gary moore <gtraining@aol.com>, jeff mix <jeff@gly.com>,
Jen Osborn (aka Allie's mom) <osborn.jennifer3@gmail.com>, Jessi Meyburg
<meyburg@mac.com>, Krista Holmberg <bkholmberg@comcast.net>, kim and justin
ross <kmross7@hotmail.com>, Lance Emerson <lansone@hotmail.com>, Lisa Moore
<elenasmommy@hotmail.com>, Lorrie Kuhn <mattlorrie@gmail.com>, mark chamberlin
<mark.a.chamberlin@ehi.com>, Marlene Emerson <marlene_emerson@hotmail.com>,
Mary Ann <cowa1@live.com>, Matt and Lorrie Kuhn <mattlorrie@verizonmail.com>,

Meredith Cook <meredithl.cook@gmail.com>, Raquel Reynolds
<rockie@unforgettable.com>, Rick Woodruff <rick@woodruffassociates.com>, Scotty
Bach <scotty_bach@yahoo.com>, shelly chamberlin <msachamberlin@comcast.net>,
Shelly Washington-woodruff <srwoodruff@comcast.net>, Shelly Woodruff
<swoodru@rei.com>, stephanie mcnamara <dsmcnamara@comcast.net>, Tina Mix
<mstinamix@hotmail.com>, Susan (Sis) Lee <chowbella2u@hotmail.com>, Wendy
Moss <ptsm_moss@hotmail.com>, <jsrekd@gmail.com>

Hello Everybody,

Hope everyone is having a great summer!  Monty's birthday is on Sunday (8/28/11) and
we would like to invite everyone over for a BBQ at around 3-4pm that day.
Bring your favorite side dish or appetizer.
We will have Chocolate cake (Monty's favorite) and some kind of meat grilling.
Please let us know if you can come, so we can figure out how much food and liquids (ie.
drinks) to get.
Call me if you need directions.

Hope to see all of you Sunday!

Wendy, Monty & Christina
--
*Rockie*

# Fwd: photos
Inbox



**Raquel Reynolds <raquel.reynolds@gmail.com>**

---------- Forwarded message ---------
From: **Raquel Reynolds** <raquel.reynolds@gmail.com>
Date: Fri, Sep 18, 2020 at 2:07 PM
Subject: Fwd: photos
To: rockie 1000 <1000rockie@gmail.com>
---------- Forwarded message ---------
From: **Raquel Reynolds** <raquel.reynolds@gmail.com>
Date: Wed, Jan 2, 2013 at 10:54 PM
Subject: Re: photos
To: scott bach <scotty_bach@yahoo.com>

I can do power point. I'm on my mac. All 10  photos are all blank.

On Jan 2, 2013 8:51 PM, "scott bach" <scotty_bach@yahoo.com> wrote:
It is a power point.  I'll send it another way. I made it on my apple lap top

Scotty Bach
PO BOX 3052
Seattle, WA 98114

206-499-1740

**From:** Raquel Reynolds <raquel.reynolds@gmail.com>
**To:** scott bach <scotty_bach@yahoo.com>
**Sent:** Wednesday, January 2, 2013 10:42 PM
**Subject:** Re: photos

Thx!
luv to see them! but cannot open.
please resend - different format?

On Wed, Jan 2, 2013 at 10:02 PM, scott bach <scotty_bach@yahoo.com> wrote:

 here are some photos.



## Raquel Reynolds <raquel.reynolds@gmail.com>

## 7 Attachments



## Raquel Reynolds <raquel.reynolds@gmail.com>

---------- Forwarded message ----------
From: **scott bach** <scotty_bach@yahoo.com>
Date: Wed, Jan 2, 2013 at 10:02 PM
Subject: photos
To: Aaron S. Reynolds <mail@aaronreynolds.com>
Cc: Raquel Reynolds <raquel.reynolds@gmail.com>

 here are some photos.
Attachments area

Fwd: SMS with Monty
Inbox



**Raquel Reynolds <raquel.reynolds@gmail.com>**

# Forwarded Conversation
## Subject: SMS with Monty
------------------------
From: <raquel.reynolds@gmail.com>
Date: Wed, Nov 16, 2011 at 1:50 PM
To: Monty <monty_moss@hotmail.com>
Evergreen will be calling you...to say thx for refering us.


----------
From: **Monty** <monty_moss@hotmail.com>
Date: Wed, Nov 16, 2011 at 1:51 PM
To: <raquel.reynolds@gmail.com>
Win-win for all of us. Did you get your cowboy hat yet? :)


----------
From: <raquel.reynolds@gmail.com>
Date: Wed, Nov 16, 2011 at 1:52 PM
To: Monty <monty_moss@hotmail.com>
Is that the gift with purchase?


----------
From: <raquel.reynolds@gmail.com>
Date: Thu, Apr 26, 2012 at 3:01 PM
To: Monty <monty_moss@hotmail.com>
How are you Monty? Thanks for helping Aaron and I find this POS. Question: could I
possibly get the exact address at 50xx 41st?  I believe it is my moms next door neighbor
but want to be sure before I tell her (mom). Thx.


----------
From: **Monty** <monty_moss@hotmail.com>
Date: Thu, Apr 26, 2012 at 3:03 PM
To: <raquel.reynolds@gmail.com>
I'm home with my sick kid now. Can you give Scotty a call? 206.499.1740.


----------
From: <raquel.reynolds@gmail.com>
Date: Thu, Apr 26, 2012 at 3:04 PM
To: Monty <monty_moss@hotmail.com>

Yes. Thanks.